RECEIVED
LAFAYETTE, LA.

MAY 2 8 2010

TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JASON MIXON

VERSUS

ANADARKO PETROLEUM
CORPORATION, ET AL.

CIVIL ACTION NO. 07-1063

MAGISTRATE JUDGE HANNA

BY CONSENT OF THE PARTIES


**MEMORANDUM RULING**


This case comes before the Court by consent, pursuant to 28 U.S.C. §636, for disposition. Pending is a motion for summary judgment filed by defendants Anadarko Petroleum Corporation and Noble Drilling (US) Inc. (Rec. Doc. 119). The motion is opposed. Considering the evidence, the law, and the arguments of the parties, and for the reasons which follow, the motion is DENIED.


## I.    FACTUAL BACKGROUND

The plaintiff, Jason Mixon, was employed by Halliburton Energy Services, Inc. and working in the course and scope of his employment as a coiled tubing operator when he was injured in an offshore accident on June 29, 2006. The Halliburton crew was working pursuant to a contract with Anadarko aboard the semi-submersible

drilling rig NOBLE PAUL ROMANO located on the Outer Continental Shelf off the coast of Louisiana.

At the time of the accident, the plaintiff and his crew were disassembling a coiled tubing reel ("CTR") on a multi-part unit designed and custom built by NOV for Halliburton. The CTR was of such size and weight that it could not be moved in one piece; consequently, it was necessary to disassemble the CTR in order for it to be moved on or off location. Part of the disassembly process included removing bolts and splitting the reel so it could be lifted. As designed and manufactured, if the CTR was on the deck, access to these bolts could be obtained without the necessity of a ladder or climbing on the equipment. However, on this particular job, the rig's crane could not put the CTR in the proper location directly on the deck. Therefore, skid beams were used to position the CTR properly.

Mounting the CTR on the skid beams elevated the CTR about four feet above where it would have been positioned had it been placed on the vessel's deck. As a result, in order to access the bolts to split the reel, the plaintiff had to use a ladder to actually climb on the equipment itself. After he had removed the bolts, while he was trying to descend from the CTR to the ladder, he slipped on a piece of iron that was not intended as a foothold and injured his knee.

-2-

## II.   CONTENTIONS OF THE PARTIES

The plaintiff contends that Anadarko and Noble were the owners, operators, and/or owners *pro hac vice* of the NOBLE PAUL ROMANO and that the plaintiff was a worker covered under the Longshore & Harbor Workers' Compensation Act ("LHWCA.") He alleges that the accident was caused by the negligence of Anadarko and Noble, and he seeks to recover under 33 USC § 905(b).

Anadarko and Halliburton entered into a Master Service Contract that obligated Halliburton to provide all necessary equipment, tools, and personnel for coiled tubing operations. The CTR used on this job was one of two different reels that were designed and custom built by NOV for Halliburton. The one that is not the subject of this lawsuit is known as the "Thunderhorse" reel. It is thirty inches taller than the CTR at issue in this lawsuit and, although not called for in the design specifications, it had folding work platforms installed at Halliburton's request that allowed access to the equipment, including access to the bolts to split the reel. The CTR involved in the instant case had no such work platforms.

The plaintiff claims that the absence of these work platforms renders the CTR unreasonably dangerous within the meaning of the Louisiana Products Liability Act. The plaintiff further contends that Anadarko and Noble were negligent in failing to guard against dangerous conditions on those parts of the vessel where the plaintiff

was expected to perform his duties, that Anadarko and Noble breached the duty they owed to make the vessel reasonably safe for the performance of the work to be done by the Halliburton crew members, and that Anadarko and Noble were negligent in allowing the CTR to be operated on the vessel without safety features, ladders, and platforms that would have permitted workers to climb down without the risk of injury that existed at the tine of the plaintiff's accident.

There is no dispute that Anadarko and Noble knew that the CTR was to be placed on skid beams and elevated four feet above the vessel's deck, since they participated in extensive preparations for the job that included devising a plan to position the CTR on the vessel. Anadarko and Noble contend, however, that they had no obligation to provide – or to require that Halliburton provide – ladders, scaffolding, or work platforms for the CTR since they allegedly did not know what specific operations the Halliburton employees would be required to perform and since Halliburton allegedly was responsible for determining the appropriate methods to safely operate its own equipment.

As is fully explained below, the undersigned finds that genuine issues of material fact concerning Anadarko and Noble's knowledge of the condition of the CTR and the work to be performed by Halliburton with regard to the CTR preclude summary judgment in favor of Anadarko and Noble.

-4-

## III.   SUMMARY JUDGMENT STANDARD

"A party against whom relief is sought may move, with or without supporting affidavits, for summary judgment on all or any part of the claim."[1]   Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[2]

"When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing  party does not so respond, summary judgment should, if appropriate, be entered against that party."[3]

As summarized by the Fifth Circuit:

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial.  However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material

---

[1]   Fed. R. Civ. P. 56(b).

[2]   Fed. R. Civ. P. 56(c)(2).

[3]   Fed. R. Civ. P. 56(e)(2).

fact warranting trial. Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"is a full trial on the merits warranted.[4]

The Supreme Court also provided guidance on the obligation of the non-moving party who bears the burden of proof at trial:

> Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit  Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.[5]

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.

*****

---

[4]     *Lindsey v Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (internal citations omitted).

[5]     *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990) (internal citations and quotations omitted).

[S]ummary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[6]

## IV.   APPLICABLE LAW AND ANALYSIS

The parties agree that the claims against Anadarko and Noble arise out of the Longshore and Harbor Workers' Compensation Act ("LHWCA"),[7] which permits a maritime employee injured during the course and scope of his employment due to the negligence of the vessel to bring an action against the vessel owner to recover damages.[8]   Interpreting Section 905(b) of the LHWCA, the Supreme Court has outlined three general duties that vessel owners and charterers owe to covered workers under Section 905(b).

The "turnover duty" concerns the condition of the ship upon the commencement of stevedoring operations[9] and essentially obligates a shipowner to: (1) turn over the ship and its equipment in reasonably safe condition; and (2) warn the

---

[6]      *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (internal citations and quotations omitted).

[7]      33 U.S.C. § 901 *et seq.*

[8]      33 U.S.C. § 905(b).

[9]      *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994), citing *Scindia Steam Navigation Co. v. De los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 1622-23, 68 L.Ed.2d 1 (1981).

stevedore of any non-obvious defects.[10]   Under the active control duty, the vessel owner may be liable for injuries if it fails to exercise due care to protect a longshoremen from a hazard he might encounter in an area – or because of equipment – that is under the active control of the vessel.[11]   The "duty to intervene" concerns the vessel's obligations with regard to operations in areas under the principal control of a stevedore.[12]

The Fifth Circuit has held that these duties are owed to any independent contractor, such as Halliburton in this case, and its harborworker employees covered by the LHWCA and working aboard ship, such as Mr. Mixon in this case.[13]   A breach of one of these duties is actionable only if it is a substantial factor in – and therefore a legal cause of – the injury sustained.[14]

---

[10]     *Meza v. MSC Ship Management HK Ltd.*, 345 Fed. App'x. 19, 20 (5th Cir. 2009), citing *Howlett v. Birkdale Shipping*, 512 U.S. at 98-99.

[11]     *Howlett v. Birkdale Shipping*, 512 U.S. at 98; *Fontenot v. McCall's Boat Rentals, Inc.*, 227 Fed. App'x. 397, 402, (5th Cir. 2007).

[12]     *Howlett v. Birkdale Shipping*, 512 U.S. at 98.

[13]     *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982); see also *Burchett v. Cargill, Inc.*, 48 F.3d 173, 178 n. 3 (5th Cir. 1995).

[14]     *Moore v. M/V Angela*, 353 F.3d 376, 383 (5th Cir. 2003); *Donaghey v. ODECO*, 974 F.2d 646, 649 (5th Cir. 1992).

As explained in detail below, the undersigned finds that there are genuine issues of material fact presented with regard to Anadarko and Noble's duty to intervene, which preclude summary judgment in favor of Anadarko and Noble. For that reason, further discussion of the active control duty and the turnover duty is pretermitted.

### The Duty to Intervene

A vessel owner is generally permitted to rely on the contractor's expert judgment as to the safety of its working conditions,[15] including the contractor's judgment that a condition, although dangerous, is safe enough to permit work to continue.[16] The vessel owner's responsibility is narrow and requires something more than knowledge that a dangerous condition exists.[17] Thus, a plaintiff cannot base a failure to intervene claim on the contention that the vessel owner should have supervised, inspected, or monitored the contractor's work.[18]

---

[15]   *Fontenot v. McCall's Boat Rentals*, 227 Fed. App'x. at 405.

[16]   *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997).

[17]   *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996).

[18]   *Howlett v. Birkdale Shipping*, 512 U.S. at 99-100.

But there are circumstances when the vessel owner has a duty to intervene. If the vessel owner (a) has actual knowledge of a dangerous condition and (b) has actual knowledge that the contractor, in the exercise of obviously improvident judgment, cannot be relied upon to remedy the situation, then the vessel owner must intervene.[19] A contractor's judgment is "obviously improvident" when the contractor continues work despite a dangerous condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm.[20] A six-factor test was developed to assist in determining if the vessel owner has a duty to intervene. The factors to be considered are: (1) whether the danger was open and obvious, (2) whether the danger was located in the ship or ship's gear; (3) which party created the danger or used the defective item and was therefore in a better position to correct it; (4) which party owned and controlled the defective item; (5) whether an affirmative act of negligence or acquiescence in the use of a dangerous item occurred; and (6) whether the shipowner assumed any duty with regard to the dangerous item.[21]

---

[19]     *Greenwood v. Societe Francaise De*, 111 F.3d at 1249; *Barrios v. Pelham Marine, Inc.*, 796 F.2d 128, 131 (5th Cir. 1986); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1038-39 (5th Cir. 1983).

[20]     *Moore v. M/V ANGELA*, 353 F.3d at 391-92; *Fontenot v. McCall's Boat Rentals*, 227 Fed. App'x. at 405; *Greenwood v. Societe Francaise De*, 111 F.3d at 1249; *Woods v. Sammisa Co.*, 873 F.2d 842, 847 (5th Cir. 1989).

[21]     *Fontenot v. U.S.*, 89 F.3d 205, 209 (5th Cir. 1996).

-10-

In this case, it is undisputed that Anadarko and Noble knew that the CTR was going to be elevated four feet above the vessel deck on this particular job and that this condition would be necessary for the entirety of the job. Anadarko and Noble were intimately involved in extensive and prolonged preparations for the job, which included making the decision to elevate the CTR on skids in order to accommodate the CTR's weight, the limitations of the vessel's crane, and the need to be able to move the CTR to a location on the vessel's deck that would allow it to be positioned properly for downhole operations.[22] Halliburton, Anadarko, and Noble all knew that, on this particular job, the CTR would be elevated on skid beams for the entire length of the job. This was not a transitory condition, and it was not a condition that was created solely by Halliburton. The decision to lift the CTR up on skid beams was made following extensive consultation and engineering efforts. Despite the knowledge that the CTR would be elevated four feet above the vessel's deck, Halliburton took no measures to ensure that its personnel would be able to climb all the way to the top of the CTR if necessary. Halliburton's corporate representative, Wallace G. Wilke, Jr. testified as follows in deposition:

> Q.    This particular reel was placed on skid beams.
>
> A.    Correct.

---

[22]    Rec. Doc. 119-6, p. 3.

> Q.    Are you aware of that?  Halliburton would have known that before the reel went out to the job?
>
> A.    Yes.
>
> Q.    Did Halliburton to your knowledge do anything to provide any additional work platforms, manlifts, anything for its employees to use given the fact that the reel was going to be situated on these skids?
>
> A.    Not that I'm aware of.[23]

This clearly establishes that Halliburton was aware, before the job began, that the CTR was to be set atop skid beams.  It also clearly establishes that Halliburton provided no special equipment for its personnel to access the top of the CTR.  This is true even though Mr. Wilke also confirmed that Halliburton was responsible for providing its employees with work platforms:

> Q.    And it would be Halliburton's responsibility to provide whatever appliances, fall protection or other work platforms for its employees to use with a coil tubing reel oriented in this fashion.
>
>                  * * * * *
>
> A.    Yes.[24]

---

[23]    Rec. Doc. 119-3, pp. 3-4.

[24]    Rec. Doc. 119-3, p. 5.

Ron Ward, Halliburton's senior man on the job, was also deposed. He testified that Halliburton knew that its personnel were using a ladder to access the CTR that required that an employee descending the CTR to step off the CTR and onto the top step of the ladder:

> Q.    You did determine that the ladder rested against a skid beam about four foot from the floor; is that right?
>
> A.    Yes.
>
> Q.    And that the employee would have had to have reached with his right foot to get onto the ladder, correct?
>
> A.    Yes.

Thus, as confirmed by Mr. Mixon's deposition testimony,[25] the Halliburton crew used a stepladder rested against the CTR, then stepped from the top of the ladder onto the CTR itself, when it was necessary to perform tasks on the top of the CTR.

When these facts are compared to six factors that must be considered, it is clear that some of the factors militate in favor of a finding that Anadarko and Noble had a duty to intervene. The first factor is whether the danger was open and obvious. The undersigned finds that it was. Elevation of the CTR four feet above the vessel deck without providing any type of work platform or even a ladder long enough to facilitate a safe climb to top of the CTR created an open and obvious danger. The

---

[25]    Rec. Doc. 119-5, pp. 5, 7; Rec. Doc. 129-9, pp. 6-12.

second factor asks whether the danger was located in the ship or the ship's gear. Although the CTR was Halliburton's equipment , the CTR was positioned where it was and elevated four feet above the vessel's deck in order to accommodate the limitations of the vessel and the vessel's equipment, particularly the crane. The third factor asks which party created the danger or used the defective item and was therefore in a better position to correct it. The elevation of the CTR was a joint decision among Halliburton, Anadarko, and Noble. Thus, Anadarko and Noble helped to create the problem and consequently were in a position to help cure it. The fourth factor asks which party owned and controlled the defective item. Although the CTR was owned by Halliburton, its placement four feet above the vessel's deck was necessitated by Anadarko and Noble's concerns about the lifting capacity of the crane, the weight of the unit, and the proximity to the downhole assembly. The fifth factor inquires about negligence or acquiescence in the use of the defective item. Since they did not require a longer ladder, scaffolding, or a work platform of any kind after requiring that the CTR be elevated, Anadarko and Noble acquiesced in the Halliburton employees' use of the CTR without adequate access to the top of the CTR. Finally, it is necessary to consider whether the shipowner assumed any duty with regard to the dangerous item. This appears to be an unanswered question.

-14-

Common sense would dictate that, in a situation in which a piece of equipment is elevated four feet above the vessel deck and bolts atop the equipment must be removed in order for the equipment to be rigged down, some type of scaffolding, manlift, or work platform – or a ladder long enough to permit a worker to climb all the way to the top of the CTR – should be provided in order for the work to be performed safely.  The undersigned finds that Halliburton's failure to provide any such device – other than a stepladder of such a length that the employee was still required to step from the top of the stepladder onto angle iron on the CTR itself – was "obviously improvident."  Therefore, if Anadarko and Noble knew that Halliburton had failed to provide such equipment to its employees, this triggered their duty to intervene.

There are certain exceptions to the vessel's duty to intervene.  The duty does not extend to an open and obvious transitory condition that is created entirely by the independent contractor, that is under the contractor's control, and relates solely to the contractor's own gear and operations.[26]  But these exceptions are not applicable in this case.  The height of the CTR and the lack of an adequate work platform to access the top of the CTR was not a transitory condition.   It existed before the job

---

[26]      *Fontenot v. McCall's Boat Rentals*, 227 Fed.App'x. at 405, citing *Futo v. Lykes Bros. S.S. Co., Inc.*, 742 F.2d 209, 216 (5th Cir.1984).

commenced and continued to exist when the unit was being rigged down and Mr. Mixon was injured. Neither the height of the CTR nor the lack of an adequate work platform were conditions created solely by Halliburton. Instead, these conditions were the result of extensive discussions among Halliburton, Anadarko, and Noble. Similarly, the CTR was under Anadarko and Noble's control to the extent that they participated in extensive preparations for placing the CTR on skids at the location where it was placed on the vessel. At least during the stage of the operations when the CTR was being placed on the vessel, it was under Anadarko and Noble's control. Finally, the elevation of the CTR and the lack of a work platform permitting access to the top of the CTR are conditions that did not relate solely to Halliburton's own gear and operations. The elevation of the CTR was necessitated by crane and vessel conditions and limitations and, for that reason, relate to Anadarko and Noble's gear and operations. For these reasons, the exceptions are not applicable.

There is a genuine issue of material fact concerning Anadarko and Noble's knowledge of Halliburton's admitted failure to provide anything more than a stepladder for its employees to access to bolts on the CTR during the downrigging process.

The plaintiff's deposition testimony is sufficient to create a genuine factual issue in that regard. Mr. Mixon testified that Noble and Anadarko personnel saw he

-16-

and other Halliburton employees struggling atop the CTR and heard he and other Halliburton employees complaining about the reel being too high.[27]  Anadarko and Noble presented no evidence refuting this testimony.  Although they presented excerpts from the deposition testimony of one Anadarko employee who was on the rig, they did not present any type of testimony from any other Anadarko employees who might have been on-site at the time the Halliburton crew was rigging down the CTR unit.  Similarly, no testimony whatsoever from any Noble employee was presented.  Therefore, a genuine issue of material fact exists concerning whether Anadarko and Halliburton knew, before the accident, that the stepladder being used by Halliburton's employees failed to provide adequate access to the top of the CTR and that Halliburton had failed to provide its employees with any type of safe work platform at the top of the CTR.

These genuine factual disputes preclude summary judgment in favor of Anadarko and Noble.  For that reason, their motion for summary judgment (Rec. Doc. 119) is DENIED.

Thus done and signed this 28th day of May 2010.

Patrick J. Hanna
Magistrate Judge

----

[27]    Rec. Doc. 119-5, p. 11.

-17-